## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

-------------------------------------------------------------- X

ANTHONY ZAPPIN,

                     Plaintiff,                          Case No. 3:20-cv-00210 _____

                  - against -

J. RICHARD SUPPLE, JR.,                           **COMPLAINT**

HINSHAW & CULBERTSON LLP,                Jury Trial Demanded

                     Defendants.

-------------------------------------------------------------- X

Plaintiff Anthony Zappin ("Plaintiff") hereby brings this action against Defendants J. Richard Supple Jr. ("Supple") and Hinshaw & Culbertson LLP ("H&C") alleging the following:

## THE PARTIES

1.      Plaintiff Anthony Zappin is a citizen of the State of West Virginia.

2.      Upon information and belief, Defendant J. Richard Supple. Jr. is a citizen of the State of New York.  Supple was formerly a partner at the law firm Hinshaw & Culbertson LLP in the firm's New York, New York office.

3.      Upon information and belief, Defendant Hinshaw & Culberston LLP is a limited liability partnership organized under the laws of the State of Illinois and maintains its principal place of business at 151 North Franklin Street, Suite 2500, Chicago, Illinois, 60606.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff has a different citizenship (West Virginia) from each of Defendants (New York, Illinois) in this action.  Additionally, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to the claims in this action occurred in this Judicial District.

## FACTUAL ALLEGATIONS

6.      This action arises from Defendants' representation of Plaintiff in an attorney disciplinary matter brought against Plaintiff by the Attorney Grievance Committee for the First Judicial Department ("Grievance Committee") located in New York, New York.  In the course of representing Plaintiff, Defendants were woefully negligent and, at numerous times, deliberately harmful and injurious to Plaintiff's defense in the attorney disciplinary matter.  As a result, Plaintiff has suffered immense damages that he seeks to redress in this action.

I.      BACKGROUND

7.      This action has its origins in Plaintiff's personal divorce and child custody matter filed against his ex-wife Claire Comfort ("Ms. Comfort"), which was captioned *Anthony Zappin v. Claire Comfort*, Index No. 301568-2014 formerly pending in New York County Supreme Court.

A.      Initial Proceedings Before The Superior Court for the District of Columbia

8.      Plaintiff and Ms. Comfort had a short relationship that began in late 2012.  They were married in May 2013 shortly after Plaintiff learned that Ms. Comfort had unexpectedly (at least to Plaintiff) become pregnant.  Their child was born on October 6, 2013.

9.      On November 10, 2013, just weeks after the child was born, Ms. Comfort and her father, Brian Comfort,[1] abducted Plaintiff's child from Plaintiff and Ms. Comfort's marital residence in the District of Columbia.  The one (1) month old child was flown over 3,000 miles to Tacoma, WA without Plaintiff's consent where the child was effectively hidden from Plaintiff by

---

[1] Brian Comfort is an attorney purportedly admitted to practice law in the State of Washington.  It appears that at least part of Brian Comfort's law practice involves matrimonial and family court litigation.

2

Ms. Comfort and her father.  At the time, Ms. Comfort was suffering from post-partem depression, which is documented in medical records, and refused to seek medical treatment.  Indeed, Ms. Comfort described herself as "unstable" and in need of "getting help" in text messages to Plaintiff during the abduction of the child.  (*See* Ex. 2, DC Petition and Emergency Motion dated 11/13/13.)

10.     Plaintiff, through counsel, filed a petition for custody and a motion for the emergency return of the child on November 13, 2013 in the Superior Court for the District of Columbia ("DC Superior Court").   (*See* Ex. 2, DC Petition and Emergency Motion dated 11/13/13.)   Notably, included in Plaintiff's filing were allegations of domestic violence that Plaintiff claimed in detail were committed against him by Ms. Comfort.  (*See id*.)  It should be further noted that Ms. Comfort subsequently admitted in sworn document to committing some of the acts of domestic violence Plaintiff alleged in his November 13, 2013 filings in the DC Superior Court, which were wholly ignored by the New York matrimonial court (*i.e.*, Justice Deborah Kaplan and Justice Matthew F. Cooper).

11.     A hearing was held before Judge Jennifer De Torro in the DC Superior Court on November 13, 2013 with respect to Plaintiff's emergency motion for the return of the child.  Judge Di Torro issued an order directing Ms. Comfort to immediately return the child to the District of Columbia.

12.     Upon learning of the filing of Plaintiff's child custody petition in DC Superior Court, Ms. Comfort (aided and assisted by her father Brian Comfort) began an erratic cascade of filings in multiple jurisdictions and courts.  In this filing, Ms. Comfort, for the first time ever, began (falsely) accusing Plaintiff of domestically abusing her beginning less than a week before the birth of the child (and never during the prior year of their relationship) as a defense to her abduction of the child and in response.  However, in the span of just one (1) week, Ms. Comfort

filed three (3) separate sworn statements with courts in Washington State and the District of Columbia with wildly different accounts (*e.g.*, different dates of alleged incidents, different supposed injuries, different numbers of alleged incidents) as to her plainly bogus allegations of domestic violence.  Notably, Ms. Comfort changed, altered and expanded her allegations in each subsequent sworn statement each time Plaintiff or his counsel presented Ms. Comfort or her counsel with evidence undermining the allegations in the previous sworn statement.

13.     A *pendente lite* hearing on child custody and visitation was scheduled before Judge Di Torro in the Domestic Relations Branch of the DC Superior Court for November 20, 2013.  The hearing was thwarted, however, by Ms. Comfort filing for a second *ex parte* temporary order of protection in the Domestic Relations Branch of the DC Superior Court three (3) hours before the start of the *pendente lite* hearing before Judge Di Torro.[2]  In her Domestic Violence Branch petition, she radically altered her allegations of domestic violence from what she alleged in her two (2) prior sworn statements, which was an effort to stifle Plaintiff's defense and thwart the *pendente lite* custody hearing from taking place that day.  As a result of Ms. Comfort's clear gamesmanship, the *pendente lite* hearing was adjourned to March 2014 so as to allow Plaintiff to gather evidence and prepare a defense for Ms. Comfort's radically altered and third set of conflicting abuse allegations.

14.     In the interim, however, Ms. Comfort once again moved the child without consent or authorization from Plaintiff or the DC Superior Court from Tacoma, Washington to New York City in February 2014.  This undermined and thwarted the DC Superior Court's jurisdiction over the child custody proceeding pending there.  Plaintiff then filed for divorce from Ms. Comfort in

---

[2] As mentioned above, Ms. Comfort obtained an *ex parte* temporary order of protection in Pierce County Superior Court in Washington State on November 13, 2014 via a kiosk the day after learning of Plaintiff's custody petition and emergency motion filed in DC Superior Court.

New York County Supreme Court in February 2014 after the DC Superior Court deemed itself an inconvenient forum to determine the issue of child custody and visitation.

15.     At this stage, Plaintiff had by Ms. Comfort's (and her father Brian Comfort's) design became stuck in a crooked and undoubtedly biased family court system.  To make matters worse, the last custody and visitation arrangement before entering the New York court system was not based on any evidence, facts or testimony.  Rather, it was agreed to by the parties so that Plaintiff could prepare a defense in the face of Ms. Comfort's gamesmanship whereby she radically altered and falsified domestic violence allegations in last minute filings in the DC Superior Court. However, it was this custody and visitation arrangement that became *de facto* permanent custody and visitation arrangement throughout the New York proceedings to the clear and undeniable prejudice of Plaintiff.

B.     The New York Divorce Proceeding before Justice Deborah Kaplan

16.     Plaintiff's divorce suit filed in New York County Supreme Court was assigned to Justice Deborah Kaplan.  The case was styled as *Anthony Zappin v. Claire Comfort*, Index No. 301568-2014, the matter from which the instant case stems.  At this time, Plaintiff was represented by the firm *Aronson, Mayefsky & Sloan LLP* ("AMS").  However, the case was marred by bizarre conduct by Justice Kaplan, most notably Justice Kaplan's imposition of supervised visitation on Plaintiff without affording him a *pendente lite* hearing required by New York law, previously agreed to by Plaintiff and Ms. Comfort in DC Superior Court and requested by Plaintiff incessantly.  *See Carlin v. Carlin*, 52 A.D.3d 559, 560 (N.Y. 2008) ("As a general rule, while temporary custody may be properly affixed without a hearing where sufficient facts are shown by uncontroverted affidavits, it is an error as a matter of law to make an order respecting custody,

even in a *pendente lite* context, based on controverted allegations without having the benefit of a full hearing.").

17.     Between April 2014 and July 2014, Plaintiff's counsel AMS requested a *pendente lite* hearing to determine temporary custody and to remove Justice Kaplan's clearly unlawful imposition of supervised visitation on four (4) separate occasions.  At each of these proceedings, Justice Kaplan refused to go on the record so as to allow Plaintiff to document and potentially appeal Justice Kaplan's orders denying his requests.   At this time, Plaintiff was paying approximately $10,000 a month in costs associated with supervised visitation – well exceeding his salary as a junior associate attorney.  This was in addition to incurring substantial counsel fees from AMS.  In effect, Justice Kaplan's refusal to provide Plaintiff with a legally required *pendente lite* hearing while continuing to direct supervised visitation played right into the strategy of Ms. Comfort, which was to financially crush Plaintiff out of the litigation and deprive Plaintiff of the financial ability to see his child.

18.     As a result, in July 2014, Plaintiff had to make the impossible financial choice of whether to continue to see the child or continue being represented by AMS and incurring legal fees.  Plaintiff made the difficult decision to represent himself *pro se* so as to financially allow him to see his child, which was entirely as a result of Justice Kaplan's unlawful refusal to afford Plaintiff a *pendente lite* hearing as required by law.  Plaintiff's decision to represent himself *pro se* – so that he could continue to see his child – was attacked at every turn by Justice Kaplan and subsequently Justice Matthew Cooper.  In effect, Plaintiff's decision to represent himself *pro se* in order to continue to have the financial ability to see his child painted a target on him for corrupt judicial actors like Justice Kaplan and Justice Cooper to shoot at and to justify their unlawful and unwarranted orders throughout the litigation.

6

19.     In an appalling act of corruption, after Plaintiff fired AMS, Justice Kaplan appointed Harriet Newman Cohen as the so-called "Attorney for the Child" at an unconscionable rate of $600 per hour.  Justice Kaplan did so without notice, consultation or an opportunity to be heard by the parties, which was particularly appalling given Ms. Cohen's exorbitant rate of $600 per hour to represent a child less than one (1) year old.  It was later discovered by Plaintiff that at the time of her appointment, Ms. Cohen was not qualified by the Appellate Division First Department to be appointed as an Attorney for the Child in New York State in contested custody matters.  Even more disconcerting, it was revealed that Ms. Cohen and her firm were substantial campaign donors to and participants in Justice Kaplan's election campaign for New York County Supreme Court Justice.  This raised serious ethical questions, most notably whether the egregious $600 per hour fee awarded to Ms. Cohen without notice to the parties was some form of a kick-back by Justice Kaplan.

20.     Approximately one (1) month after Ms. Cohen's appointment in October 2014, Justice Kaplan indefinitely "stayed" the case after Plaintiff filed a motion to recuse her as Attorney for the Child.  Plaintiff's motion was based on several disconcerting and largely unrefuted actions by Ms. Cohen.[3]   This notably included:  (i) Ms. Cohen serving unnoticed secret subpoenas on Plaintiff's medical providers without court authorization and then harassing those medical

---

[3] In addition to egregious misconduct within the context of *Zappin v. Comfort*, Ms. Cohen had also made patently sexist, discriminatory and bigoted public remarks concerning men.  *See* "Divorce Lawyers Criticized by Consumer Affairs Chief," *available at* https://www.nytimes.com/1992/03/13/nyregion/divorce-lawyers-criticized-by-consumer-affairs-chief.html;  *see also* "Trouble in Splitsville," *available at* http://nymag.com/nymetro/news/crimelaw/features/1670/ (characterizing Ms. Cohen as a "vocal feminist who is disdained by many of her colleagues at the bar" and quoting Ms. Cohen as demanding women receive "very, very substantial child support, the nannies that she needs, her traveling, her clothing … a townhouse and a chauffeur-driven car" in divorce proceedings).  Ms. Cohen's bigoted public statements and her vocal third-wave feminist anti-male diatribes fundamentally called into question her ability to act in the best interests of the child as an Attorney for the Child.

providers; (ii) Ms. Cohen's bias in failing to serve subpoenas on Ms. Comfort's medical providers, which would have had information relevant to her allegations of domestic violence as well as Ms. Comfort's history of drug and alcohol abuse; (iii) Ms. Cohen making blatantly false, fabricated and incendiary allegations that Plaintiff had abused the child with a thermometer, allegations that were refuted by supervisors and later affirmatively abandoned by Ms. Cohen; (iv) Ms. Cohen repeatedly violating and disregarding court orders, including with respect to the confidentiality of the forensic custody evaluation report; (iv) Ms. Cohen admittedly failing to conduct any investigation into the facts of the case, which was further reflected by her billing statements, as required by the guidelines for Attorneys for the Child in the Appellate Division First Department and instead taking an unqualified "Believe Her" (*i.e.*, Ms. Comfort) approach to the case; and (v) Ms. Cohen making numerous knowing and variable misstatements and misrepresentations to the New York court about Plaintiff and the child.

21.     Plaintiff was eventually required to withdraw the disqualification motion as Justice Kaplan refused to decide it after months of waiting for a decision by Justice Kaplan, despite the urgency of the case.  While the "stay" resulting from the motion was ongoing, Plaintiff was still incurring tens of thousands of dollars a month in costs for supervised visitation and was unable to hire counsel.  More importantly, the imposed "stay" resulting from the motion and Ms. Cohen's misconduct was being used by Justice Kaplan to frustrate Plaintiff's requested *pendente lite* hearing on child custody and lifting the unconstitutionally imposed supervised visitation.

C.     Plaintiff's New York Court of Claims Lawsuit

22.     As the *Zappin v. Comfort* matter continued, it became increasingly frustrating for Plaintiff.  Justice Kaplan refused to make any effort to move the case forward.  For instance, she refused to issue any order, written or otherwise, that would enable him to appeal her imposition of

supervised visitation.  Likewise, Justice Kaplan used any excuse to deny Plaintiff his right to a *pendente lite* hearing.  Plaintiff was being financially overwhelmed with the cost of supervised visitation, particularly given the fact it prevented him from hiring counsel.  And, most notably, Justice Kaplan allowed Ms. Cohen to engage in a mountain of misconduct prejudicial to Plaintiff, as mentioned *supra*, with no consequences whatsoever.  At this stage and as a result of the harm that was being inflicted on Plaintiff's child, Plaintiff started to become vocally critical of Justice Kaplan on the Internet.

23.     In March 2015, Plaintiff unearthed an otherwise buried transcript of the criminal trial of Justice Kaplan's father in the Eastern District of New York.  Justice Kaplan's father was a drug dealer and hitman for a notable crime family in New York City.  In the transcript, Justice Kaplan testified in her father's defense.  In her testimony, Justice Kaplan appeared to make several damning admissions, which included:  (i) she frequented the warehouse/building where her father operated his criminal enterprise; (ii) money from her father's criminal enterprise was used to pay for her husband's legal education; and (iii) her father's assets, including the family home, were transferred into her name (presumably in an attempt to avoid criminal forfeiture).  (*See* Ex. 3, Excerpt of Transcript of Deborah Kaplan's Testimony.)  Most notably, however, Justice Kaplan disparaged a domestic violence victim who was a key witness in the prosecution's case against of her father.  (*See id*.)  Justice Kaplan subsequently became aware that Plaintiff had obtained the buried transcript.  Plaintiff had given it to several other fathers who had cases pending before Justice Kaplan and were experiencing similar difficulties.  As a result, the transcript eventually made its way to the Internet and was spreading throughout the courthouse.

24.     On April 24, 2015, a conference was held before Justice Kaplan in *Zappin v. Comfort*.  At the conclusion of the hearing, Plaintiff was quietly waiting for his counsel in the

9

gallery. For no apparent reason, Plaintiff was grabbed from the gallery by Justice Kaplan's personally assigned court officer, Jeffrey Katz ("Officer Katz"). Plaintiff was then hauled and shoved to a side hallway by Justice Kaplan's courtroom, pushed against a wall and confined for several minutes without explanation by Officer Katz. As a result of the incident, Plaintiff had several serious injuries and was treated at a New York hospital. In true Mafioso form, both Justice Kaplan and Officer Katz denied that anything took place, despite detailed evidence of Plaintiff's injuries.

25.     On April 30, 2015, Plaintiff filed an action in the New York Court of Claims against Officer Katz and Justice Kaplan relating to the above-described incident on April 24, 2015. (*See* Ex. 4, Zappin Court of Claims Complaint.) It was served by certified mail on the New York Attorney General's Office on May 5, 2015. Just over two (2) weeks later, Justice Kaplan was not only removed from the *Zappin v. Comfort* matter, but she was stripped of over ninety-percent (90%) of her caseload and reassigned to an administrative position in the New York Unified Court System with the title "Statewide Coordinating Judge for Family Violence."[4] (*See* Ex. 5, FOIL Spreadsheet of Justice Kaplan's Reassigned Cases.)

## II.     THE SCHEME TO RETALIATE AGINST AND DISCREDIT PLAINTIFF BY NEW YORK OFFICIALS

26.     As set forth above, within days of Plaintiff filing his Court of Claims action, Justice Kaplan was effectively removed from the bench. As a result, the Court of Claims action, Plaintiff's open criticism of Justice Kaplan's unlawful decisions (which included filing a mandamus proceeding against her to try to force a *pendente lite* hearing) and Plaintiff's unearthing the

---

[4] Justice Kaplan's reassignment was announced on the "News and Announcements" webpage for the New York Unified Court System. However, it was later taken down. It can now only be found on the archive                          site.                          *See* https://www.nycourts.gov/courts/1jd/supctmanh?News_&_Annoucements_Archive.shtml.

transcript containing Justice Kaplan's damning testimony in her father's criminal case, Plaintiff became a target as he was seen as a threat to Justice Kaplan's rising career in the judiciary. A small group within the New York Unified Court System, the New York Office of Court Administration and the NYAGC banded together to plot a scheme to use and manipulate the *Zappin v. Comfort* divorce action as a means to publicly disgrace, discredit and eventually disbar Plaintiff in retaliation for Plaintiff uncovering the transcript of Justice Kaplan's testimony as well as his New York Court of Claims action filed against her. This group was led by three (3) individuals: Justice Deborah Kaplan, Justice Matthew Cooper and Kevin M. Doyle, a crooked and corrupt staff attorney for the NYAGC.

        A.    <u>The Unusual and Unexplained Transfer of *Zappin v. Comfort* to Justice Matthew Cooper</u>

27.    After Justice Kaplan was transferred to an administrative position in May 2015 just days after the New York State Attorney General was served with Plaintiff's Court of Claims complaint against her, *Zappin v. Comfort* was transferred to Justice Matthew Cooper on May 22, 2015 (with the first appearance being July 22, 2015) under highly irregular circumstances. *Zappin v. Comfort* was one of the first, if not the first, case transferred from Justice Kaplan's docket. (*See* Ex. 5, FOIL Spreadsheet of Justice Kaplan's Reassigned Cases.) Even more astonishing, **<u>out of approximately 150 cases transferred from Justice Kaplan's docket, *Zappin v. Comfort* was the only case transferred to Justice Cooper</u>**. (*See id*.) Justice Kaplan's remaining cases were transferred to newly appointed judge, Justice Frank Nervo. (*See id*.)

28.    The transfer to Justice Cooper was peculiar for a number of reasons. First, Justice Cooper was a longtime friend and defender of Justice Kaplan. Indeed, both Justice Kaplan and Justice Cooper came up through the New York court system in nearly identical fashion. Moreover,

upon information and belief, Justice Cooper did work for and/or worked with Justice Kaplan's father when Justice Cooper was an attorney for the Teamsters in New York.

29.     Second, and more importantly, Justice Cooper was well-known for having a penchant for publicly embarrassing and deriding litigants.  In the months before being assigned to *Zappin v. Comfort*, Justice Cooper was responsible for numerous headlines in The New York Post and The New York Daily News ridiculing and shaming litigants.  These included, but were not limited to:

- "Divorce Judge Slams 'Bed-Pooping, Cokehead' Banker, Alcoholic Wife" by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2015/01/08/judge-blasts-banker-wife-for-horrible-fiasco-of-a-divorce/[5];

- "Judge Calls Carnegie Deli Manager 'The Shyster of Smoked Meat'" by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2015/08/05/judge-calls-carnegie-deli-manager-the-shyster-of-smoked-meat/;

- "Judge Slam Paul George For Being a Deadbeat Dad," by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2014/09/23/judge-slams-nba-star-for-being-a-deadbeat-dad/; and

- "Judge Rips 'Broke' Deadbeat Dad Who Skied in Alps," by Julia Marsh, published in The New York Post, *available at* https://nypost.com/2015/05/14/deadbeat-dad-claimed-poverty-while-taking-european-ski-trips/.[6]

And, to make matters worse, Justice Cooper had just months prior given testimony before the New York Assembly in which he stated that he "shamed" matrimonial litigants into outcomes he

---

[5] Notably, the father in this custody dispute lost his job as a result of the article instigated by Justice Cooper and published in The New York Post.

[6] It should be noted that Justice Cooper apparently engaged in *ex parte* communications with Julia Marsh, the New York Post reporter who published the disgraceful article, presumably to instigate the publication of the article to publicly embarrass Mr. Phillips.  (*See* Ex. 6, E-mail from I. Phillips to A. Zappin.)

believed were just, even when those outcomes did not comport with the law.  As discussed further below, Justice Cooper employed the same unethical and shameful tactics in *Zappin v. Comfort* of publicly shaming Plaintiff in The New York Post and The New York Daily Mail as part of the ongoing scheme and ploy to discredit and publicly disgrace Plaintiff in retaliation for his First Amendment-protected criticisms of and legal actions taken against Justice Kaplan.

30.     Despite numerous inquiries, Plaintiff never received an explanation from the New York court or the New York Office of Court Administration why *Zappin v. Comfort* was singled out and assigned to Justice Cooper.  However, based on the subsequent behavior of both Justice Cooper and the NYAGC, it was apparent that the *Zappin v. Comfort* proceeding was being used and manipulated to retaliate against Plaintiff.  This was apparent throughout the proceeding.

     D.     <u>A Brief History of the New York Divorce Proceeding before Justice Cooper</u>

31.     Justice Cooper began formally presiding over *Zappin v. Comfort* on July 22, 2015. Without Plaintiff even opening his mouth in Justice Cooper's courtroom, Justice Cooper unjustly and without notice or opportunity to be heard sanctioned Plaintiff on September 18, 2015 as part of the scheme to retaliate against Plaintiff for his criticisms and legal actions taken against Justice Kaplan.  *See Zappin v. Comfort*, 2015 NY Slip Op 51339(U) (hereinafter, the "Sanctions Decision").  The Sanctions Decision contained numerous misstatements and misrepresentations concerning Plaintiff's conduct.  (*See* Ex. 7, Addendum of Justice Cooper's Misconduct and Biased Behavior in *Zappin v. Comfort*.)  Indeed, as shown in Plaintiff's chart, Justice Cooper's misstatements and misrepresentations were verifiably inaccurate based on the *Zappin v. Comfort* record.[7]  (*See id*.)

---

       [7] It should be noted that Plaintiff appealed Justice Cooper's Sanction Decision to the Appellate Division First Department.  Among the various issues raised, Plaintiff asserted that he was denied notice and an opportunity to defend himself with respect to the sanction and Justice Cooper's questioning his

32.     Most importantly, though, Justice Cooper engaged in outrageous, egregious and, most notably, prejudicial behavior by admittedly personally disseminating the Sanctions Decision to the press (specifically, *The New York Law Journal*, *The New York Post* and *The New York Daily News*) to incite media coverage of the Sanctions Decision and the *Zappin v. Comfort* matter.[8]  Not only was this conduct extrajudicial behavior, but it was in direct violation of New York Domestic Relations Law Section 235, a statutory provision which specifically prohibits judges from disseminating files in matrimonial cases in New York.  Notably, the United States District Court for the Southern District of New York has held that Justice Cooper's act of personally disseminating the Sanctions Decision to the media was an extrajudicial act.

33.     Apart and aside from the numerous misrepresentations of fact in the Sanctions Decision, the intent to inflict harm on Plaintiff through disseminating the Sanctions Decision was apparent:  (i) Justice Cooper openly and publicly questioned Plaintiff's fitness to practice law without affording him any notice or opportunity to be heard prior to making such declarations; (ii) Justice Cooper publicly branded Plaintiff as a domestic abuser before a single document was entered into evidence by prominently and repeatedly stating that Ms. Comfort had accused Plaintiff of domestic violence in the Sanctions Decision despite Ms. Comfort's allegations being impertinent to the motions then pending before Justice Cooper and the fact that Plaintiff was first to allege he had been domestically abused by Ms. Comfort; and (iii) Justice Cooper resorted to petty name calling to catch headlines by asserting that Plaintiff was a "fool."  *Zappin v. Comfort*, 2015 NY Slip Op 51339(U) (2015).

---

ability to practice law.  The Appellate Division First Department affirmed the Sanction Decision in a perfunctory order failing to address Plaintiff's constitutional arguments.

[8] It should be noted that Justice Cooper provided the press with an advanced draft of the Sanctions Decision, which differed in formatting and contained typographical errors.

34.     Plaintiff consequently suffered extreme harm as a result of Justice Cooper's improper, unlawful and extrajudicial conduct surrounding the Sanctions Decision.  This including Plaintiff losing his job at *Mintz Levin* (which affected his ability to hire counsel for the November 2015 child custody trial ordered by Justice Cooper and otherwise prosecute the case) and creating unnecessary and harmful tabloid media coverage over the case that was largely disparaging to Plaintiff and irreparably harmful to the child.  Importantly, as a result of Plaintiff losing his job, he could not afford to hire trial counsel for the child custody trial in *Zappin v. Comfort*, which he had planned to do.

35.     No reasonable person would disagree that the Sanctions Decision was part and parcel to the scheme to retaliate against Plaintiff.  Indeed, without Plaintiff having any opportunity to defend himself, Justice Cooper violated New York sealing laws by publicly issuing the Sanctions Decision and personally disseminating it to the tabloid media in an effort to publicly humiliate, disgrace and destroy Plaintiff.  This intent was apparent by the fact that Justice Cooper publicly questioned Plaintiff's ability to practice law without notice or an opportunity to defend himself as well as labeled Plaintiff a domestic abuser before a single piece of evidence was placed before the matrimonial court.  Indeed, as discussed *infra*, the Sanctions Decision was the catalyst for the NYAGC and Kevin Doyle to initiate a blatantly harassing and unfounded "*sua sponte*" attorney disciplinary investigation against Plaintiff.  In other words, the Sanctions Decision was written, published and disseminated to the press in conjunction with the NYAGC and its staff attorney Kevin Doyle.

36.     It must be noted, though, Justice Cooper's improper, unlawful and extrajudicial behavior with respect to the Sanctions Decision created an apparent and serious conflict of interest in the proceeding.   By engaging in extrajudicial conduct by personally disseminating his

disparaging and verifiably untrue statements to the tabloid press through the Sanctions Decision, it put Justice Cooper in a position where his credibility was not publicly at issue and in direct conflict with Plaintiff's credibility.  Moreover, by engaging in unlawful and extrajudicial conduct that caused Plaintiff to lose his job and incited disparaging publicity towards him, it unquestionably placed Justice Cooper in a position where his future rulings had to justify the harm he inflicted on Plaintiff, particularly when making rulings concerning child custody and visitation.  This was particularly so with respect to Ms. Comfort's allegations of domestic violence.  Specifically, no reasonable person would conclude that he was in a position to fairly adjudicate the parties' allegations of domestic violence given that Justice Cooper violated state sealing law and publicly branded Plaintiff a domestic abuser – which caused Plaintiff to lose his job – before the start of the child custody trial before a single piece of evidence was placed in the trial record.  In other words, Justice Cooper was in a compromised position and was not going to subsequently dismiss Ms. Comfort's domestic violence allegations at trial after he publicly credited them in the Sanctions Decision.  Moreover, most significantly, by personally and deliberately inciting and exposing the child to tabloid media coverage in a sealed child custody matter pending before him, it fundamentally called into question Justice Cooper's ability to make decisions in the best interests of the child.  Consequently, Justice Cooper's extrajudicial conduct with respect to the Sanctions Decision precluded him from being an impartial arbiter at the child custody trial in *Zappin v. Comfort*, which commenced in November 2015 just two (2) months after the Sanctions Decision.

37.     Despite the clear basis for Justice Cooper's recusal from the case based on his improper, prejudicial and extrajudicial conduct associated with the Sanctions Decision, Justice Cooper refused to step down from the case despite Plaintiff making a formal motion seeking his recusal.  Instead, he presided over the child custody trial that commenced on November 12, 2015.

16

However, Justice Cooper continued to engage in outrageous and prejudicial conduct throughout the pre-trial proceedings and the custody trial itself that not only fundamentally called into question the fairness of the *Zappin v. Comfort* proceeding, but that would make any reasonable observer question Justice Cooper's fitness to sit on the bench.  (*See, e.g.*, Ex. 8, Addendum of Justice Cooper's Misconduct and Biased Behavior in *Zappin v. Comfort*.)

38.     The child custody trial in *Zappin v. Comfort* concluded on December 21, 2015 after thirteen (13) days of trial.  On February 29, 2016, Justice Cooper issued his Decision and Order After Custody Trial (hereinafter "Custody Decision").[9]  Yet again, the Custody Decision, much like the Sanctions Decision, was marred by Justice Cooper's misconduct and contrived findings, which is further set forth below.  (*See also* Ex. 8, Addendum of Justice Cooper's Misconduct and Biased Behavior in *Zappin v. Comfort*.) However, it bears pointing out, Justice Cooper made dozens upon dozens of "findings" in the Custody Decision adverse to Plaintiff that found no support whatsoever in the trial record and that were outright fabricated.  (*See* Ex. 9, Chart of Justice Cooper's Fabrications in Custody Decision provided by Plaintiff to Defendants.)

39.     The Custody Decision, however, represented a change in course in the scheme by Justice Kaplan, Justice Cooper and Kevin Doyle to discredit, disgrace and disbar Plaintiff.  As the "*sua sponte*" investigation fizzled as a basis for seeking retaliatory attorney discipline against Plaintiff, it was conceived that the child custody trial and ultimately the Custody Decision could be used to "short-circuit" the attorney disciplinary process.  Specifically, the Custody Decision was written and drafted by Justice Cooper in conjunction with Kevin Doyle and the NYAGC to be used as a basis for seeking attorney discipline against Plaintiff.  Indeed, as discussed *infra*, the

---

[9] The Custody Decision is sealed pursuant to New York law.  Defendant has a copy of it, however. Plaintiff will provide a copy to the Court under seal.

NYAGC and Kevin Doyle used numerous fabricated findings made by Justice Cooper in the Custody Decision as a basis to seek the imposition of attorney discipline via collateral estoppel on Plaintiff.

40.     With respect to the actual merits of the case, Justice Cooper ruled entirely against Plaintiff.  More specifically, Justice Cooper's Custody Decision gave Ms. Comfort full custody of Plaintiff and Ms. Comfort's child.  Although Justice Cooper denied Ms. Comfort and the Attorney for the Child's unfounded request that Plaintiff be entirely denied access to the child,[10] Justice Cooper directed that Plaintiff continue to have limited supervised visitation with the child for at least a period of eighteen (18) months at a cost of approximately $5,300 a month, despite the fact that Plaintiff was jobless as a result of Justice Cooper's extrajudicial misconduct of disseminating the Sanctions Decision to the New York tabloids.  As expected based on his publicly branding Plaintiff a domestic abuser in the Sanctions Decision prior to trial, Justice Cooper credited Ms. Comfort's allegations of domestic violence and entered a five (5) year order of protection against Plaintiff, which Ms. Comfort did not even request.

Plaintiff subsequently appealed Justice Cooper's Custody Decision to the Appellate Division First Department.   The Appellate Division First Department failed to address any of Plaintiff's contentions made on appeal and summarily affirmed Justice Cooper's Custody Decision.  This was the same Appellate Division First Department that also heard the attorney disciplinary matter brought against Plaintiff by the NYAGC, which as discussed *infra* granted the NYAGC's April

---

[10] Throughout the proceeding, there was never an allegation that Plaintiff had ever harmed or attempted to harm the child.  Rather, Plaintiff had two (2) years of spotless supervisor reports that characterized him as a loving, caring and attentive father.  Moreover, five (5) supervisors testified at trial who all confirmed that they had never seen any behavior from Plaintiff that they believed was inappropriate, a danger to the child or that would warrant supervised visitation.

22, 2016 Collateral Estoppel Petition based entirely on the Custody Decision before Plaintiff even had an opportunity to appeal the Custody Decision.

### COUNT 1: NEGLIGENCE/LEGAL MALPRACTICE (WV Law License)
### (All Defendants)

41.    Plaintiff re-alleges and incorporates by reference paragraph 1 – 70 of this Complaint as though fully set forth herein.

42.    As legal counsel for Plaintiff, Defendants owed Plaintiff duties of professional care, loyalty, diligence and skill.

43.    By engaging in the conduct set forth above, Defendants failed to exercise ordinary reasonable care and diligence used under the same or similar circumstances by attorneys and thereby breached those duties of professional care owed to Plaintiff.

44.    As a direct and proximate result of Defendants' negligence and failure to exercise reasonable diligence and care in their representation of Plaintiff, Plaintiff has suffered injury and damages with respect to his West Virginia law license. These damages include, but are not limited to, attorneys fees, lost wages and damage to his reputation. The total amount of Plaintiff's injuries and damages should be determined at trial.

### COUNT 2: NEGLIGENCE/LEGAL MALPRACTICE (DC Law License)
### (All Defendants)

45.    Plaintiff re-alleges and incorporates by reference paragraph 1 – 74 of this Complaint as though fully set forth herein.

46.    As legal counsel for Plaintiff, Defendants owed Plaintiff duties of professional care, loyalty, diligence and skill.

19

47.     By engaging in the conduct set forth above, Defendants failed to exercise ordinary reasonable care and diligence used under the same or similar circumstances by attorneys and thereby breached those duties of professional care owed to Plaintiff.

48.     As a direct and proximate result of Defendants' negligence and failure to exercise reasonable diligence and care in their representation of Plaintiff, Plaintiff has suffered injury and damages with respect to his District of Columbia law license.  These damages include, but are not limited to, fees, lost wages and damage to his reputation.  The total amount of Plaintiff's injuries and damages should be determined at trial.

## COUNT 3: BREACH OF CONTRACT
### (All Defendants)

49.     Plaintiff re-alleges and incorporates by reference paragraph 1 – 78 of this Complaint as though fully set forth herein.

50.     Through the conduct alleged in this Complaint, Defendants materially breaches their express and implied contractual obligations to Plaintiff that it would take all action legally necessary and appropriate to protect Plaintiff's interests in the collateral estoppel disciplinary action; that it would perform all legal services with due care and diligence; and that it would provide Plaintiff with professional, skilled and careful lawyers to handle the proceeding.

51.     Moreover, Defendants breached each of the terms forth in Paragraph 58, where such terms were material to the agreement that Plaintiff would allow Defendants to continue to represent him in the collateral estoppel disciplinary proceeding.

## JURY TRIAL DEMANDED

Plaintiff demands a jury on all issues which may be properly tried by jury.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays that the Court:

(a)     Enter judgment in favor of Plaintiff against Defendant

(b)     Enter judgment award Plaintiff compensatory damages on all counts herein to compensate Plaintiff for Defendants' activities complained of herein and for any injury complained of herein, inclusive of interests and costs, in an amounted to be determined at trial;

(c)     Enter judgment awarding punitive, exemplary, enhanced and/or treble damages as allowed by applicable state and federal law in an amount to be determined at trial;

(d)     Enter judgment awarding Plaintiff his fees and costs reasonably incurred in this action as allowed by applicable state and federal law; and

(e)     Order such other relief that the Court deems just and appropriate.


Dated: March 23, 2020
       Huntington, WV


_____
ANTHONY ZAPPIN
1827 Washington Blvd.
Huntington, WV 25701
(304) 730-4463 (tel.)
*anthony.zappin@gmail.com*
*Plaintiff, Pro Se*

21